# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ASHLEY BITSILLY, by and through her
mother and sole guardian, TRACY DENET-
YAZZIE; and LARRY BARNELL, by and
through his mother and sole guardian,
LORETTA YAZZIE,

      Plaintiffs,

      vs.                              No. CIV 99-1390 LH/RLP

BUREAU OF INDIAN AFFAIRS; JAMES
H. McDIVVITT, in his official capacity as
Assistant Secretary of the Bureau of Indian
Affairs; UNITED STATES DEPARTMENT
OF THE INTERIOR; and GALE NORTON,
in her official capacity as Secretary of the
United States Department of the Interior,

      Defendants.

## MEMORANDUM OPINION AND ORDER

      **THIS MATTER** comes before the Court on Defendants' Motion to Dismiss Plaintiffs' First

Amended Complaint and Corrected Motion to Dismiss Plaintiffs' First Amended Complaint (Docket

Nos. 118 and 124), filed July 5, 2002 and July 23, 2002, respectively. The Court, having considered

the briefs submitted by the parties, and otherwise being fully advised, finds that Defendants' motion

is **well-taken in part** and should be **granted in part and denied in part.**

## BACKGROUND

This lawsuit arises out of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§1400 to 1487 (2002),[1] as it applies to the provision of special educational services to qualified Indian children attending "tribally controlled schools."[2]  Initially, the five named plaintiffs sought class certification.  Some students had claims stemming from their attendance at schools operated by the Bureau of Indian Affairs ("BIA" or "Bureau"), and others had claims arising from their attendance at schools operated by local communities or tribal entities under the Tribally Controlled Schools Act ("TCSA"), 25 U.S.C. §§2501 to 2511.  Plaintiffs alleged that Defendants failed to ensure that the schools complied with the IDEA and charged that they were denied a free appropriate public education ("FAPE")[3] as a result.

In a Memorandum Opinion and Order dated June 21, 2001, the Court granted summary judgment on all claims except those arising from the attendance of two students, Ashley Bitsilly and

---

[1]The statutes at issue in this case have been amended and re-numbered since the commencement of this case in 1999.  The substance of the statutes has not changed, for the most part.  Unless otherwise noted, the Court will cite and quote to the 2000 bound volume of the United States Code, as amended by the 2002 pocket parts, as well as the 2002 Code of Federal Regulations, unless there is a material difference.

[2]A "tribally controlled school" is defined as "a school, operated by a tribe or a tribal organization, enrolling students in kindergarten through grade 12, including preschools, which is not a local educational agency and which is not directly administered by the Bureau of Indian Affairs." 25 U.S.C. §2511(5).

[3]A "free appropriate public education" is defined as "special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary, or secondary education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.  20 U.S.C. §1401(8).

Larry Barnell, at tribally controlled schools.  Memorandum Opinion and Order (Docket No. 113),
entered June 21, 2001 (hereinafter, "2001 Memorandum Opinion and Order"), at *37-38.

Upon oral motion, the Court allowed Plaintiffs to amend their complaint, which they filed on
June 7, 2002.  The amended complaint eliminated all but the IDEA claims of Ashley Bitsilly and Larry
Barnell for the period beginning when they attended tribally controlled schools to the present.  First
Amended Complaint for Declaratory and Injunctive Relief (Docket No. 113), filed June 7, 2002.
Plaintiffs did not name the tribally controlled schools, their tribal administrative agencies, or any
individual officials of those entities as defendants.

Plaintiffs claim they were denied FAPE and due process hearings when they attended tribally
controlled schools.  Their allegations focus on Defendants' general failure to supervise, monitor,
evaluate and ensure that tribally controlled schools comply with the requirements of the IDEA.
Plaintiffs urge that Defendants have the same supervisory relationship with tribally controlled schools
that a "state educational agency" ("SEA") has with its local educational agencies ("LEAs") or its
schools.  They assert that, like SEAs, Defendants have the responsibility to ensure that disabled
children receive a FAPE at BIA funded schools, even schools that are now tribally controlled.
Plaintiffs also allege that Defendants failed specifically to ensure that the tribally controlled schools,
Ch'hooshgai Community School ("CCS") and Hopi Junior/Senior High School ("Hopi"), complied
with the substantive and procedural requirements of the IDEA, and this hands-off approach injured
Ashley and Larry by rendering meaningless the procedural safeguards built into the IDEA.

Ashley's allegations are more particular still.  She avers that Defendants ignored her mother's
requests that they intervene on Ashley's behalf or provide an independent due process hearing,
despite having express notice of her dissatisfaction and a specific request for a due process hearing.

As a result, her mother claims that Ashley was deprived of opportunities for a FAPE and continues to suffer in her academic abilities.

Plaintiffs pray for a declaratory judgment that the actions and omissions of the BIA in failing to enforce the requirements of the IDEA at tribally controlled schools violated their rights under the IDEA. *Id.*, ¶¶A. Plaintiffs also seek the "compensatory education" and related services denied to them as a result of Defendants' policies and inaction with respect to the tribally controlled schools. First Amended Complaint, ¶E. Finally, and most comprehensively, Plaintiffs request the Court to enjoin BIA "from engaging in actions, omissions, policies, and practices which have resulted in their failure and refusal to enforce the requirements of the IDEA for the schools for which they provide IDEA funds" and to compel Defendants "to ensure the effective and expeditious implementation of their duties [to] guarantee the protection of Plaintiffs' rights...." *Id.*, ¶¶B-C.

The BIA has filed a motion to dismiss the amended complaint in its entirety based on Plaintiffs' lack of standing and/or mootness, failure to state a claim, failure to exhaust administrative remedies, the unreviewability of the Defendants' administration of IDEA grant funds, and the failure to join the schools and tribal entities, whom they argue are indispensable defendants. On the merits, the BIA has always contended that the TCSA circumscribes its authority to supervise or monitor tribally controlled schools, other than approving a school's application to become "tribally controlled" and serving as a conduit for grants from the Department of Education to the schools.

## STANDARD OF REVIEW

Defendants primarily challenge Plaintiffs' standing based on the facts of this lawsuit. Both parties have submitted attachments to their briefs for the Court's consideration. "When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the

complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).  In such instances, a court's references to evidence outside the pleadings does not convert the motion to a Rule 56 motion."  *Pringle v. United States*, 208 F.3d 1220, 1222 (10th Cir. 2000).  In this case, the parties do not dispute the general facts.  Nevertheless, the Court has reviewed the parties' submissions, but generally finds them unilluminating.  In the absence of helpful submissions, the Court looks to the allegations of Plaintiffs to resolve a motion to dismiss.

## DISCUSSION

### I.   JUSTICIABILITY

Defendants charge that this case is not justiciable on a number of bases, including standing. In order for a case to be justiciable, a plaintiff must possess standing.  "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

As the party seeking jurisdiction, the burden is on the plaintiffs to establish standing affirmatively. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990), and the Court must conduct a separate standing analysis for compensatory and injunctive relief. *Friends of the Earth*, 528 U.S. at 185.

A.      **Compensatory and Declaratory Relief**[4]

1.      *Injury in Fact*

Both plaintiffs claim they were deprived of educational opportunities and have suffered regression in their academic achievements as a result of that deprivation. Ashley claims that she was excluded from school functions at CCS because teachers and other school personnel were inadequately trained to work with her to correct her behavior, and the general curriculum at the school was not modified to meet her special needs. Larry claims that Hopi never evaluated him for eligibility for special educational services, despite his mother's request for an evaluation, nor were special education or behavior modification services provided to him. Additionally, Larry alleges that he was constructively expelled from Hopi permanently for disciplinary reasons, with no recognition of the connection between his behavior and his learning and emotional disabilities.[5] Both plaintiffs assert that they were not provided with due process hearings.

The deprivation of a FAPE is an actual injury suffered by a student and his or her parents. *Honig v. Doe*, 484 U.S. 305, 310-11 (1988). Congress recognized this when it declared the rights of all qualifying children to receive a FAPE and acknowledged the civil rights aspects of the IDEA. 20 U.S.C. §1400(c)(6) ("While States, local educational agencies and educational service agencies are responsible for providing an education for all children with disabilities, it is in the national interest that the Federal Government have a role in assisting State and local efforts to educate children with

_____

[4]Plaintiffs' entitlement to declaratory relief is dependant on whether Defendants violated the IDEA. Any award of compensatory relief would necessarily flow from a declaration that Defendants violated the requirements of the IDEA and injured Plaintiffs. Thus, the Court will not separately analyze Plaintiffs' standing for the declaratory claims.

[5]Plaintiffs allege that Hopi informed Larry's guardians that he was wasting the school's time and he would be expelled indefinitely if they did not withdraw him. First Amended Complaint, ¶55.

disabilities in order to improve results for such children *and to ensure equal protection of the law*.")
(emphasis added).  Congress also incorporated comprehensive procedural safeguards into the IDEA.
*E.g.*, 20 U.S.C. §1415(f)(1) (parents' right to an impartial due process hearing) and §1415(i)(2)(A)
(private right of action to bring a civil lawsuit in state or federal court).

The Supreme Court has suggested that the procedural safeguards of the IDEA are just as
protected as the substantive requirement of a FAPE.  *Bd. of Educ. of Hendrick Hudson Central*
*School Dist. v. Rowley*, 458 U.S. 176 (1982).  As the *Rowley* Court emphasized,

> When the elaborate and highly specific procedural safeguards embodied in § 1415 are
> contrasted with the general and somewhat imprecise substantive admonitions
> contained in the Act, we think that the importance Congress attached to these
> procedural safeguards cannot be gainsaid.  It seems to us no exaggeration to say that
> Congress placed every bit as much emphasis upon compliance with procedures giving
> parents and guardians a large measure of participation at every stage of the
> administrative process, as it did upon the measurement of the resulting IEP against
> a substantive standard.

*Id*. at  205-06 (citations omitted); *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992) ("The central
role of the IDEA process rights bears witness that Congress intended to create procedural rights the
violation of which would constitute injury in fact.").  *But see T.S. v. Indep. Sch. Dist. No. 54*, 265
F.3d 1090, 1095 (10th Cir. 2001) (holding that, without a claim that a student's FAPE was deficient,
a deprivation of procedure was not actionable after the student graduated).

In contrast to the student in *T.S.*, the plaintiffs in this case have alleged substantive
deprivations of FAPE, *i.e.*, exclusion from class outings, inadequately trained aides, and constructive
expulsion, *accompanied by* the complete denial of due process hearings.  These are actual, concrete,
and particularized injuries in fact that fulfill the first requirement of standing to sue for compensatory
relief.

## 2.       *Traceability to Defendant's Conduct*

In addition to showing an injury in fact, a plaintiff must also assert that the injury suffered is "fairly traceable to the defendants' allegedly unlawful conduct." *Dep't of Commerce v. United States House of Representatives*, 525 U.S. 316, 329 (1999).  Defendants argue that Plaintiffs cannot connect their injuries to the actions or inactions of the Bureau or the Department of the Interior because the schools acted independently, and Defendants had no duty to oversee the schools or assure their compliance with the IDEA.  Defendants' Brief at *21 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)).

In *Lujan*, the Supreme Court addressed whether a plaintiff has standing when she asserts a claim against a governmental agency for its allegedly unlawful regulation (or lack of regulation) of a third party, and that entity caused the injury to the plaintiff.  504 U.S. at 562.  The *Lujan* plaintiffs challenged the Secretary of the Interior's interpretation that the Endangered Species Act did not require other federal agencies to consult with the Department of the Interior when they funded projects in foreign nations that might threaten endangered species.  *Id.* at 558-59.  In that case, the other agencies were the third parties causing the alleged injuries to the plaintiffs.  *Id.* at 561-62.  The Lujan Court held that, while traceability and redressability were not precluded in such cases, they were significantly harder for a plaintiff to establish.  *Id.*

In this case, Plaintiffs challenge the agencies' interpretation of statutes (the IDEA and the TCSA) just like the plaintiffs in *Lujan*.  However, unlike *Lujan,* Plaintiffs do not object to Defendants' interpretation of those statutes as they apply to the responsibilities of other agencies, but rather as they apply to their *own* duties.  Because Plaintiffs allege that their injuries flow *directly* from Defendants' policy of inaction, this case does not require the Court to engage in the more intense

traceability and redressability analysis set out in *Lujan*.  Instead, the Court should determine whether and to what degree Defendants have a duty to oversee tribally controlled schools and/or assure their compliance with the IDEA.  If Defendants do have such responsibilities by law, then the injuries allegedly suffered by Plaintiffs' will be traceable to Defendants.

a)      The IDEA

The IDEA, originally entitled the Education for All Handicapped Children Act of 1975 ("EAHCA"), was enacted when Congress recognized that the majority of the Nation's disabled children were not receiving educational services.  *E.g.,* S. Rep. No. 94-168 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1426.  The Act is often referred to as a funding statute, but the legislative history indicates that the shortcomings in public schools' special education programs were sourced not only in budgetary constraints, but also in a lack of will to provide educations for disabled children that met their individual needs.  *Honig*, 484 U.S. at 309-10.

Under the IDEA, the state educational agencies ("SEAs") must assure the Department of Education that qualifying children will receive a FAPE in the least restrictive environment, after the creation of an individualized education program.  20 U.S.C. §1412(a)(1), (4) and (5).  The SEA must also provide a structure under which the provisions of the IDEA are implemented, including a forum for impartial hearing officers to try to resolve the inevitable disagreements between parents and schools as to the appropriate education for the student.  *Id.*, §1412(a)(6).  Additionally, the SEAs must ensure that the requirements of the IDEA are met, *id.*, §1412(11); 34 C.F.R. §300.141, even if the SEA must provide the services itself.  *Id.*, §§1412(b) and 1413(h)(1); 34 C.F.R. 300.360(a).

In most instances, parents of students bring IDEA lawsuits against the school or the local educational agency where the school is located, rather than the SEA.  However, parents do have the

option of suing at the highest level of accountability, the SEA.  Mayes & Zirkel, State Educational Agencies and Special Education: Obligations and Liabilities, 10 B. U. Pub. Int. L. J. 62, 85 (2000) (collecting cases).  Professors Mayes and Zirkel posit that the pursuit of remedies against the SEA, rather than the LEA or school, will become an increasingly popular way to bring IDEA claims, especially in cases where the SEA's infrastructure was flawed or monitoring of the schools ineffective.  *Id.* at 62.

In *Heldman v. Sobol*, for example, the Second Circuit Court of Appeals held that a parent demonstrated that his child's injury was fairly traceable to the actions of the Commissioner of Education for the state of New York.  962 F.2d at 156.  Although the direct cause of the injury stemmed from the actions of a biased hearing officer, that hearing officer was chosen according to a state-created system that did not comply with the IDEA.  *Id.*

Similarly, in *Corey H. v. Bd. of Educ. of the City of Chicago*, the LEAs' systemic failure to provide education in the least restrictive environment was imputed to the Illinois Department of Education, which lacked guidelines and failed to monitor individual LEAs for compliance.  995 F.Supp. 900 (N.D. Ill. 1998).  *See also, Gadsby v. Grasmick*, 109 F.3d 940, 952-53 (4th Cir. 1997) (holding that the state of Maryland Department of Education may be held liable for a school's failure to provide a FAPE); *Cordero v. Penn. Dep't of Educ.*, 795 F.Supp. 1352 (M.D. Penn. 1992) (holding that the state of Pennsylvania's failure to ensure the LEAs' compliance with the IDEA injured the plaintiffs by allowing delays in evaluations);  *Georgia Ass'n of Retarded Citizens v. McDaniel*, 511 F.Supp. 1263 (N.D. Ga. 1981) (concluding that the Education of the Handicapped Act places responsibility in the SEA to assure children are provided a FAPE), *adopted as modified by* 740 F.2d 902 (11th Cir. 1984).

The IDEA makes similar demands of the Department of the Interior and the BIA with respect to the education of children with disabilities who attend schools funded by the Secretary of the Interior. The Secretary of the Interior is essentially required to wear the hat of an SEA. 20 U.S.C. §1411(i). Subpart (2) requires the Secretary of Interior to provide the Secretary of Education with: "(B) ...a description of how the Secretary of the Interior will coordinate the provision of services...with local educational agencies, tribes and tribal organizations...; (E) ...an assurance that the Secretary of the Interior and the Secretary of Health and Human Services have entered into a memorandum of agreement...for the coordination of services, resources, and personnel between their respective Federal, State, and local offices and with State and local educational agencies and other entities to facilitate the provision of services to Indian children with disabilities residing on or near reservations; and (F) ...*an assurance that the Department of the Interior will cooperate with the Department of Education in its exercise of monitoring and oversight of this application....*" 20 U.S.C. §1411(i)(2)(B), (E) and (F) (emphasis added).

Moreover, most of the IDEA regulations promulgated to govern the SEAs apply to the Secretary of the Interior as well. 34 C.F.R. §300.267 (listing the majority of IDEA regulations with which the Secretary of the Interior shall comply). Included in the adoption are 34 C.F.R. §§300.600 to 300.621, which essentially duplicate the language of 20 U.S.C. §1412(a)(11) ("The State educational agency is responsible for ensuring that (i) the requirements of this subchapter are met; and (ii) all educational programs for children with disabilities in the State, including all such programs administered by any other State or local agency (I) are under the supervision of individuals in the State who are responsible for educational programs for children with disabilities; and (II) meet the educational standards of the State educational agency."). Section 300.715(d) addresses the duties

of the Secretary of the Interior herself: "The Secretary of the Interior shall meet all of the requirements of Part B of the Act for the children [enrolled in elementary and secondary schools for Indian children operated or funded by the Secretary of the Interior], in accordance with §300.260."

It cannot be refuted that the IDEA contains comprehensive oversight duties and accountability provisions for SEAs or that the Department of the Interior functions like an SEA for schools operated by the Bureau.  The complication arises when the school is "tribally controlled" under the TCSA. From their arguments in this case, Defendants apparently have interpreted the TCSA as removing *all* of their responsibility to monitor the tribally controlled schools or assure compliance with the IDEA. The Court disagrees with this interpretation and concludes that the TCSA does not alter the BIA's responsibilities under the IDEA, both to the Department of Education and the disabled children the IDEA is designed to serve.

> b)      *The TCSA*

In enacting the TCSA, Congress attempted to perpetuate and perfect the goals set out in the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§450 *et seq.* ("ISDEAA"), by offering Indian tribes even more control over their elementary and secondary schools than was provided under the ISDEAA.  The TCSA created the potential for a large measure of independence for approved tribally controlled schools because it provided for the BIA to dispense funding to qualifying schools in the form of grants, and gave the schools more autonomy.

However, the TCSA did not end the federal government's trust relationship with and responsibility to the tribes, 25 U.S.C. §2501(b), and it did not "terminate, modify, suspend, or reduce the responsibility of the Federal Government to provide a program," 25 U.S.C. §2502(e). Congress's stated goal was "to provide the *resources, processes, and structures* that will enable tribes and local

communities to obtain the quantity and quality of educational services and opportunities that will permit Indian children (1) to compete and excel in areas of their choice; and (2) to achieve the measure of self-determination essential to their social and economic well-being." 25 U.S.C. §2501(c).

At the time the alleged IDEA violations took place, the BIA seems to have washed their hands of any responsibility to assure that the provisions of the IDEA were adhered to by tribally controlled schools.  For example, in a document from the BIA's Director of the Office of Indian Education Programs ("OIEP") entitled Memorandum to Education Line Officers ("ELOs"), dated September 19, 1997 ("Morris Memorandum"), the OIEP notified the ELOs that the requirements for due process hearings had not changed after the separate IDEA regulations had been rescinded and the regulations applying to SEAs had been adopted for BIA operated schools.   Additionally, the Morris Memorandum stated, "Tribal contract or grant schools may also utilize and/or modify these procedures or, *at their discretion, establish their own Due Process procedures* which meet the requirements found in P.L. 105-17."  A later document from the Director, dated September 12, 2000 ("Mehojah Memorandum"), acknowledged the gap in providing structure and assuming accountability for IDEA violations by tribally controlled schools.  BIA and Interior recognized that it had not yet addressed what "steps that the BIA may take, pursuant to the Tribally Controlled Schools Grant Act, in the event IDEA deficiencies are found at a grant school."[6]

The BIA now maintains that it does not, and indeed *cannot*, monitor the tribally controlled schools for compliance with the IDEA because of the limitations placed on it by the TCSA.  For instance, section 2503(b)(1)(B) clearly states that "tribally controlled schools for which grants are

---

[6]These documents were more fully discussed in the Court's 2001 Memorandum Opinion and Order, at *8-11.

provided shall not be subject to any requirements, obligations, restrictions, or limitations imposed by the Bureau that would otherwise apply solely by reason of the receipt of funds" provided under federal law, including the IDEA.  Defendants argue that, because the tribally controlled schools cannot be subjected to any further requirements or limitations, they (Defendants) are absolved of the SEA duties to monitor and assure that the tribally controlled schools comply with the IDEA.  The Court finds that Defendants' interpretation of the TCSA is unreasonable.

c)      Statutory Construction

In evaluating a federal agency's interpretation of a statute, the Court must apply the two-part test in *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  First, the Court must ask whether Congress has spoken directly to the question at issue and if its intent is clear in the statute.  If so, the Court must give effect to the intent of Congress.  *Id.* at 842-44.  If Congress has not spoken to the precise question and the statute is silent or ambiguous, the Court must defer to the administrative agency's interpretation, as long as it is a "permissible construction of the statute," and not "arbitrary, capricious, or manifestly contrary to the statute."  *Id.*

In this case, the TCSA does modify the relationship between the Bureau and tribally controlled schools and may protect the tribally controlled schools from intervention by Defendants, but that is not the issue before the Court.[7]   The TCSA does not affect Defendants' considerable responsibilities to the Department of Education and to the children served by the IDEA and other federal statutes.  To the contrary, the TCSA clearly states Congress's "commitment to the

---

[7]If this relationship were at issue, the Court would be required to apply the rule of *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997), which requires that ambiguities in Indian self-determination statutes be interpreted liberally in favor of the tribes.

maintenance of the Federal Government's unique and continuing trust relationship with and responsibility to the Indian people...," declares the national goal as one to provide not only resources, but also "processes and structure..." to enable Indian children to compete and excel in the areas of their choice, and does not alter the Federal Government's responsibility to "provide a program."

At best, the TCSA is silent about Defendants' continuing duties toward Indian children under the IDEA, but by including these trust relationship provisions Congress surely did not intend for Defendants simply to *do nothing*. *Cf. Corey H.*, 995 F.Supp. at 918 (SEA liable for taking no corrective action whatsoever). Defendants' interpretation of the TCSA as setting its responsibilities at nil when a school is tribally controlled is unreasonable and manifestly contrary to both the IDEA and the TCSA. It creates the absurd result of providing fewer protections for Indian disabled children than for non-Indian disabled children.

Having determined that the TCSA does not absolve the BIA of its responsibility to disabled children attending tribally controlled schools, and in light of Plaintiffs' allegations of Defendants' complete inaction, the Court concludes that Plaintiffs' past injuries are fairly traceable to Defendants' conduct.

### 3.    *Redressability*

For the final prong of standing, Plaintiffs must allege that a favorable judgment would redress their injuries. *Whitmore v. Arkansas*, 495 U.S. 149, 155-56 (1990). To do this, Plaintiffs must show that there is a causal connection between their injuries and the relief they seek, *Allen v. Wright*, 468 U.S. 737, 751 (1984), and that Plaintiffs would realize a probable benefit if the requested relief were granted, *Family & Children's Ctr., Inc. v. School City of Mishawaka*, 13 F.3d 1052, 1058 (7th Cir. 1994).

Neither Plaintiff alleges specifically how the Court's grant of compensatory education now would redress the denial of FAPE and due process hearings that occurred during the months or years the students attended the tribally controlled schools.[8]   This is impossible, in part, because Ashley was never afforded any review whatsoever of her IEP or its implementation by CCS, and Larry was never evaluated for special educational services by Hopi or provided a due process hearing.

Despite Plaintiffs' inability to articulate exactly what compensatory relief would be appropriate for Defendants to provide, it is clear that they contemplate educational and related services.  These are services that Defendants could provide directly to Plaintiffs, if so ordered.  Of course, compensatory education is causally connected to Plaintiffs' claim of regression in their academic progress, and an order for Defendants to provide compensatory education, would clearly benefit Plaintiffs personally.  Therefore, the element of redressability has been fulfilled for Plaintiffs' compensatory education claims.

---

[8]Plaintiffs have not suggested what would be appropriate compensatory education for the alleged denial of educational opportunities and related services.  Ashley alleges that she has not attended the CCS since May, 2000 because she "graduated" from that school.  If she currently attends a New Mexico school, as the BIA alleges, she may have a new IEP in place that addresses her educational and related needs and will make her whole for the alleged shortcomings in her education at CCS, mooting her claims for compensatory education.  *E.g., Bd. of Educ. of Downers Grove Grade School Dist. No. 58 v. Steven L.*, 89 F.3d 464, 467 (1996) (when student graduated from the eighth grade and entered a high school where parents agreed to a new IEP, claim for denial of FAPE at old school was moot).  On the other hand, Ashley may be entitled to compensatory education for the deprivations at CCS that cannot or will not be "fixed" by her new school by the time she graduates.

Larry's case is somewhat simpler if he truly has not attended school since his withdrawal from Hopi in 1999.  If Larry is determined to have been entitled to special education in 1999, his re-enrollment in school and the provision of special educational services to compensate for any regression would certainly be a step in the right direction of redressing his injuries.

-16-

The Court acknowledges that it addressed the issue of Plaintiffs' standing in its 2001 Memorandum. This opinion simply provides a more in-depth analysis of the three prongs of standing. Plaintiffs have alleged that they suffered an injury in fact, that is, the denial of a FAPE and a regression in their academic achievement. The Court is convinced that, by law, this injury is fairly traceable to the inaction of Defendants in their failure to provide a structure for the implementation of IDEA programs at tribally controlled schools, and to assure that the substantive and procedural rights of disabled Indian children are protected, as required by the statute and regulations. Finally, if the Court awards compensatory education to Plaintiffs, it is clear that such award would be causally connected to their injuries and would personally benefit them. Therefore, Plaintiffs have standing to pursue their claims for past harms, and their claims for compensatory relief will not be dismissed.

### 4.    *Mootness*

In contrast to standing, the concept of mootness comes into play when a plaintiff had standing at the time the complaint was filed, but circumstances have changed such that there no longer is a live controversy. If a controversy ceases to exist, the action is moot and this court lacks subject matter jurisdiction. *Fischbach v. N.M. Activities Ass'n.*, 38 F.3d 1159, 1160 (10th Cir.1994). As an alternative to their standing objections, Defendants argue that Ashley's claims should be dismissed as moot because she graduated from and no longer attends CCS and has alleged no intention to return there. As for Larry, Defendants assert that his claims are moot because he no longer attends any school and, in any event, no longer lives within the geographic district served by Hopi.

That Ashley has not shown an intention to return to CCS has no bearing on the justiciability of her claim for compensatory relief. While graduation and receipt of an uncontested diploma from a high school might trigger a dismissal for mootness, *see T.S.*, 265 F.3d at 1092 (10th Cir. 2001), that

outcome is not warranted in this case at this time.  The Court is unaware of whether Ashley's educational and related needs are currently being met by her new school or, for that matter, that Ashley is actually attending a new school that has an IEP in place.  If Ashley can prevail on the merits of her case, she may be entitled to compensatory education to be provided by Defendants.  *But see Downers Grove*, 89 F.3d at 467 (mooting claims against grade school district when parents agreed to IEP at high school).

The same is true for Larry.  Defendants' argument that Larry should not be entitled to bring a lawsuit because he does not attend school is particularly disingenuous because one of the substantial allegations is that he was constructively expelled from that school.  Moreover, whether Larry is currently eligible to attend school at Hopi is irrelevant for determining the propriety of granting compensatory education for the academic regression he alleges.  If it is determined on the merits that Larry was denied a FAPE and entitled to compensatory education, there is no reason Defendants cannot provide it at another location.  The claims for compensatory damages, therefore, will not be dismissed on mootness grounds.

**B.     Injunctive Relief**

In order to correct future injury, Plaintiffs request the Court to enjoin the BIA to construct a nation-wide system to monitor and ensure that all tribally controlled schools comply with the IDEA. For a plaintiff to possess standing to a claim for this type of broad-ranged injunctive relief, he must allege that he faces "a real and immediate threat that he would again suffer similar injury in the future."  *Adarand Contractors v. Pena*, 515 U.S. 200, 211 (1995).  The future injury must be "concrete" and "particularized," not "conjectural" or "hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  In *Lujan*, the Supreme Court found the plaintiffs lacked standing for

injunctive relief because their "'some day' intentions" to return to geographic areas of animal habitat did not sufficiently allege an imminent injury.  *Id*. at 564.

In this case, the Court agrees with Defendants that neither plaintiff has demonstrated that the injury they suffered is likely to occur in the future.  The amended complaint does not allege that Ashley wishes to return to any tribally controlled school where she might suffer such repeat injuries. Similarly, while Larry's guardians indicated in 2001 that they wished to re-enroll him in the Hopi school, they have not alleged that they still wish enroll him in a tribally controlled school in their amended complaint.  In any event, it is not apparent to the Court that the injuries suffered by Plaintiffs before would occur again.  Despite Defendants' failure to monitor and assure compliance with the IDEA, it is not a forgone conclusion that the *schools* will not comply with the IDEA if Plaintiffs were to return to them.  Because neither plaintiff can demonstrate a future injury with sufficient likelihood, the Court need not address the traceability and redressability elements of standing.  Plaintiffs' claims for injunctive relief calling for the overhaul of the system must be dismissed.[9]

## II.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

In this case, the Court has already determined that Ashley Bitsilly exhausted her administrative remedies when her mother requested a due process hearing from CCS and the BIA and neither afforded her a hearing.  2001 Memorandum Opinion and Order, at *24 (citing *Ass'n for Cmty. Living in Colorado v. Romer*, 992 F.2d 1040, 1044 (10th Cir. 1993)).  While it is true that Larry's guardians did not pursue administrative remedies with either Hopi or the BIA, exhaustion is excused when

---

[9]Because Plaintiffs have not alleged a sufficient likelihood of future injury, the Court has kept its analysis short.  The issue of the far-reaching injunctive relief that Plaintiffs seek is left for adjudication in another case.

"[a]dministrative remedies are generally inadequate or futile, or where plaintiffs allege structural or systemic failure and seek systemwide reforms.  The same is true where plaintiffs assert violations of the IDEA's due process provisions."  *Romer*, 922 F.2d at 1044 (internal citations omitted).  The record indicates that Larry's guardians did meet with the Hopi administrators, but they allege that Hopi never told them of their right to a due process hearing or their right to bring a civil action under the IDEA.  Having no information about their administrative obligations, Larry's guardians are excused from exhausting their administrative remedies.  Neither Ashley's nor Larry's cases will be dismissed for failure to exhaust administrative remedies.

## III.   UNREVIEWABILITY OF BIA GRANT ADMINISTRATION

Defendants argue that the BIA administration of tribally controlled school grants is not within the range of matters over which the IDEA gives this Court jurisdiction.  However, with the rulings made in this Memorandum Opinion and Order dismissing the claims for injunctive relief, the Court will not be reviewing the administration of tribally controlled school grants in this case.  Instead, the Court has restricted the questions in this case to whether the BIA is liable for compensatory education of Plaintiffs as a result of the alleged deprivation of a FAPE.  Such an inquiry is clearly within the scope of the IDEA, as the Court discussed in Section II(A)(2) above.  The Court will not dismiss the remaining claims on this basis.

## IV.   FAILURE TO JOIN INDISPENSABLE PARTIES

Finally, Defendants assert that the Court must dismiss the case in its entirety because Plaintiffs have failed to join the tribally controlled schools, whom they claim are necessary to this litigation and indispensable.  Defendants argue that, because the tribally controlled school is the real party in interest, the tribal entity operating it is a necessary party to the case.  Additionally, they claim that the

-20-

schools are necessary parties because they would be "subject to the broad injunction sought by plaintiffs." Defendants' Brief at *24. Defendants further aver that the schools are indispensable because sovereign immunity would prevent their joinder, citing *Enterprise Management Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 894 (10th Cir. 1989) (holding that, when a party is necessary under Rule 19(a), but immune from suit, "there is very little room for balancing of other factors set out in Rule 19(b)..." and the tribal party is indispensable) (internal citations omitted)).

For their part, Plaintiffs contend that the schools do not have a legal interest in the determination of Defendants' responsibilities toward Plaintiff and, therefore, are not necessary parties. "The focus of this case is the relationship between the Defendants, especially the Bureau of Indian Affairs, and Native American students with disabilities. Whether the school has a responsibility to these students and the scope of that responsibility does not affect the responsibility that the Defendants have toward them." Plaintiffs Response Brief at *20. Plaintiffs further argue that, even if the tribally controlled schools do have an interest in this action, the schools and/or tribes are not indispensable because Defendants can represent the interests of the schools and there is no conflict of interest between Defendants and the schools. *Id.* The Court agrees with Plaintiffs' analysis, in part.

Rule 19 of the Federal Rules of Civil Procedure controls the determination of compulsory joinder. Rule 19(a) states:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest

or (ii) leave any of the persons already subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest...

Fed. R. Civ. P. 19(a). Generally, unless there is an overriding policy reason, the Court should respect a plaintiffs' choice of defendant(s). 4 Moore's Federal Practice, §19.02[1] (3d ed. 2002).

In this case, Plaintiffs have sued the Bureau of Indian Affairs, the Department of the Interior, and their officers in their official capacities. Plaintiffs specifically did *not* sue the tribes, the community school "districts," the schools, or the personnel or officers of any of those entities. Many courts have interpreted the IDEA as allowing parents to sue SEAs, especially when the parents allege a systemic violation or a failure to monitor type of claim. This Court has applied such reasoning to the BIA when the disabled child attends a BIA funded school, even when it is tribally controlled. The BIA's duty does not arise out of a *respondeat superior* or strict liability relationship. *Beard v. Teska*, 31 F.3d 942, 953-54 (10th Cir. 1994). It is an independent responsibility to assure that a disabled child receives a FAPE.

Defendants' reliance on *Guthrie v. Circle of Life*, 176 F.Supp.2d 919, 922 (D. Minn. 1999), is misplaced. The *Guthrie* case addressed whether the Indian tribe that administered a school subject to an IDEA lawsuit was a necessary and indispensable party. The *Guthrie* court concluded that the tribe was necessary and indispensable because the tribe, as the equivalent of a local educational agency, would have to pay any judgment that might be rendered against the school. 176 F.Supp.2d at 923. Here, neither the schools nor the tribal entities that may administer them would be subject to a judgment against Defendants to provide compensatory education. It may be that the BIA would contract with one of these schools to provide the educational services at its own expense, but this

Court cannot force the tribally controlled schools to do so.  Moreover, the tribally controlled schools no longer have an interest in general injunctive relief because these claims have been dismissed.

Defendants have focused squarely on the indispensability prong of Rule 19 analysis without first convincing the Court that the schools and tribal entities are necessary for just adjudication of this case.  The BIA and Interior have the duty and the wherewithal to grant complete relief to Plaintiffs in the form of compensatory education, if it is warranted.  Moreover, there has been no indication that either the schools or the operating tribal entities has claimed an interest in the subject of this action.  Finally, Defendants have failed to establish that the BIA and Interior will be subject to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations" by reason of the non-joinder of the schools and tribal entities in the case.  The Court concludes, under the circumstances, that neither the tribally controlled schools nor the tribal entities that administer them is a necessary party, and the Court need not enter into the analysis of whether they are indispensable.

## CONCLUSION

The Court is not unaware of the difficult position the Tribally Controlled Schools Act has created for Defendants because, on one hand, it establishes that the tribally controlled schools will not be subjected to any restrictions, such as an SEA might impose on an LEA in a comparable state system, based solely upon the schools' receipt of IDEA funds.  On the other hand, the TCSA perpetuates the strong and unique trust obligations the Federal Government has to the tribes, through the BIA and Interior.  The Court has interpreted the substance of the trust duty in this context as the duty to provide a structure for the tribally controlled schools, but also a "safety net" for the disabled children when the schools allow them to fall through the cracks.  Such is the enigmatic nature of Indian self-determination.  Given federal courts' recent trend of giving serious effect, not just lip-

-23-

service, to the Government's trust duties in other contexts, this Court may not release Defendants from that duty, without direction from the Congress.  Most telling of all is the absence of any changes in the IDEA that would affect the duties of the BIA and Interior to act as an SEA.

Given the state of the law, as it was when the alleged IDEA violations occurred as well as now, it is impossible for the Court to conclude that Plaintiffs do not have standing or that there is no set of facts under which Plaintiffs could prevail.  Defendants' motion to dismiss the claims for declaratory and compensatory relief, therefore, will be denied.  However, even a liberal interpretation of Plaintiffs' allegations does not sufficiently express a danger of imminent future harm that would warrant further litigation of the broad injunctive relief they have requested.  Defendants' motion to dismiss Plaintiffs' claims for injunctive relief will be granted.

**IT IS, THEREFORE, ORDERED** that Defendants' motion to dismiss Plaintiffs' claims for declaratory and compensatory relief is **denied.**

**IT IS FURTHER ORDERED** that Defendants' motion to dismiss Plaintiffs' claims for injunctive relief is **granted.**

**IT IS FURTHER ORDERED** that a status conference shall be scheduled shortly to hear suggestions from the parties on how to proceed in the most expeditious manner to resolve this case, given the rulings contained in this Memorandum Opinion and Order.

**UNITED STATES DISTRICT JUDGE**

-24-